UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MELISSA MORRISON,<br><br>Plaintiff,<br><br>-against-<br><br>SG MEDICAL PROFESSIONAL P.C., MEDSERV MANAGEMENT CORPORATION d/b/a THE MEDSERV GROUP, and EVAN NEWMAN, individually,<br><br>Defendants. | Civil Action No.:<br>1:26-cv-01456-TAM<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff MELISSA MORRISON ("Plaintiff"), by and through her attorneys, Joseph & Norinsberg, LLC, as and for her Amended Complaint against SG MEDICAL PROFESSIONAL P.C., ("Defendant SG Medical"), MEDSERV MANAGEMENT CORPORATION d/b/a THE MEDSERV GROUP ("Defendant MedServ, together with SG Medical, "Corporate Defendants"), and EVAN NEWMAN, individually ("Defendant Newman"), individually (collectively, "Defendants"), alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. This civil action seeks damages and equitable relief based upon willful violations that Defendants committed of Plaintiff's rights guaranteed to her by: (i) the anti-retaliation provisions of the False Claims Act ("FCA"), 31 U.S.C. §3730(h); (ii) the anti-retaliation provisions of the New York False Claims Act ("NYFCA"), N.Y. State Fin. Law § 191; (iii) the anti-retaliation provisions under the New York Labor Law ("NYLL"), NYLL § 740; (iv) the

anti-retaliation provisions under the New York Labor Law ("NYLL"), NYLL § 741; and (v) any other violations that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

2. This case arises from Defendants' attempt to force a licensed medical provider to participate in healthcare billing fraud, and their swift retaliation when she refused.

3. Plaintiff Melissa Morrison is an experienced Family Nurse Practitioner who was hired by Defendants to serve as the sole medical provider for Defendants' newly launched telemedicine practice serving homebound patients. Instead of operating a legitimate medical practice, Defendants quickly revealed that they expected Plaintiff to rubber-stamp documentation for services she never ordered, supervised, or reviewed so that those services could be billed and paid.

4. In August 2025, Defendants delivered Plaintiff a 224-page packet containing fifty-two patient "Care Plans," all predating Plaintiff's employment, and demanded that she certify under penalty of law that the patients were under her care and that she had authorized the services reflected in those plans. Plaintiff had never treated these patients, never ordered the services, and had no role in their care. The certification was false.

5. Defendants made clear why the signatures were required: the documents were needed so that the services could be billed and payment obtained.

6. Plaintiff refused. As a licensed clinician, she would not falsify medical records or attest to care she did not provide.

7. Defendants' response was immediate hostility and intimidation. Moments after Plaintiff refused to sign the backdated certifications, Defendants warned that they would need to

"justify" her employment because patient volume was supposedly too low—an excuse that had never previously been raised.

8. Weeks later, Defendants again attempted to enlist Plaintiff in fraud. A representative associated with the program instructed Plaintiff to alter a patient's medical record to falsely state that the patient was experiencing "exacerbation of extreme back pain" in order to secure approval for services. The patient and the patient's daughter had told Plaintiff the opposite during the evaluation.

9. Plaintiff again refused to falsify the record and explicitly asked whether she was being asked to fabricate medical information.

10. Approximately twenty minutes later, Defendants terminated Plaintiff's employment.

11. Federal and New York whistleblower laws prohibit exactly this kind of retaliation. The False Claims Act, 31 U.S.C. § 3730(h), and the New York False Claims Act, N.Y. State Fin. Law § 191, protect employees who attempt to stop or refuse to participate in fraudulent schemes designed to obtain payment from government healthcare programs. New York Labor Law §§ 740 and 741 likewise protect employees—and healthcare professionals in particular—who object to or refuse to participate in unlawful conduct and practices that endanger patients or the public.

12. Plaintiff engaged in protected activity when she refused to sign fraudulent care plans, objected to falsifying medical records, and opposed practices she reasonably believed constituted healthcare billing fraud and violations of medical and legal standards.

13. Defendants retaliated against Plaintiff because of that protected activity, terminating her employment immediately after she refused to falsify a patient's medical record.

14. Through this action, Plaintiff seeks the remedies provided by federal and New York whistleblower laws, including reinstatement, double back pay, compensatory damages, and attorneys' fees, as well as all other relief necessary to remedy Defendants' unlawful retaliation.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under 31 U.S.C. §3730(h). The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

16. Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2), as Defendants reside within this judicial district, and a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

### ***Plaintiff***

17. At all relevant times, Plaintiff worked for Defendants in New York and was an "employee" entitled to the protections as defined by the FCA, the NYFCA, NYLL § 740, and NYLL § 741.

### ***Defendants***

18. Defendant SG Medical is a domestic professional service corporation duly organized under the laws of New York, with its principal place of business located at 260 Christopher Lane, Suite 102A, Staten Island, NY 10314, accepting service of process through the Secretary of State at 1729 Stuart Street, Brooklyn, New York 11229.

19. Defendant MedServ is a domestic corporation duly organized under the laws of New York, principal place of business located at 260 Christopher Lane, Suite 102A, Staten Island, NY 10314, and accepts service of process at 20890 Cipres Way, Boca Raton, Florida 33433.

20. Defendant SG Medical and Defendant MedServ operated as joint employers of Plaintiff and functioned as a single integrated enterprise with respect to the employment of clinicians providing services through the MedServ network. MedServ serves as the management and administrative services organization that operates, manages, and controls the network of affiliated professional corporations, including SG Medical. The entities share the same principal place of business at 260 Christopher Lane, Suite 102A, Staten Island, New York, maintain overlapping management personnel, and operate through centralized administrative, operational, and billing systems that support the delivery of medical services to long-term care facilities throughout the region.

21. MedServ exercised substantial control over the essential terms and conditions of Plaintiff's employment, including recruiting and hiring her, setting her compensation, assigning her work locations and schedules, directing the provision of services to facility clients, supervising performance, and administering payroll, human resources, credentialing, and billing operations for the affiliated professional corporations in the MedServ network, including SG Medical.

22. The Corporate Defendants maintained centralized control over labor relations and personnel decisions and operated with common management and unified business operations such that the entities functioned as a single employer and/or alter egos of one another. As a result, SG Medical and Medserv jointly employed Plaintiff and are jointly and severally liable for the unlawful conduct alleged herein.

23. Defendant Newman is an individual who, at all relevant times, was an owner, officer, and/or managing agent of Defendant SG Medical with authority over Plaintiff's employment.

24. At all relevant times herein, Defendants collectively constituted "employers" within the meaning of the FCA, the NYFCA, NYLL § 740, and NYLL § 741.

## BACKGROUND FACTS

***Plaintiff's Hiring and Defendants' New Telemedicine Venture***

25. On June 22, 2025, Plaintiff, a highly-qualified and experienced Family Nurse Practitioner, applied for a Telemedicine Primary Care Nurse Practitioner position with Defendants.

26. During Plaintiff's interviews with Defendant Newman, Defendant Newman described a new telemedicine venture in partnership with Girling that would provide services to home-bound patients.

27. Defendant Newman informed Plaintiff that Plaintiff would be the sole medical provider for this new venture, tasked with creating a workflow and eventually training additional providers as patient volume grew.

28. Stressing an urgent need and a high volume of patients from Girling, Defendant Newman pressed Plaintiff to start work earlier than Plaintiff's initial offer letter stated, moving Plaintiff's start date up to July 14, 2025.

29. From July 14, 2025, through August 21, 2025, Plaintiff saw an average of 4-7 patients per day.

30. Defendant Newman repeatedly reassured Plaintiff that this was an expected slow start and that patient volume would soon increase as Girling staff became more familiar with the new workflow.

31. At no point during this initial period was Plaintiff's performance or patient volume criticized.

***<u>Defendants Demand Plaintiff Participate in a Fraudulent Backdating Scheme</u>***

32. The professional environment soured on August 22, 2025, when Defendant Newman informed Plaintiff that Defendant Newman had a large caseload of patient "Care Plans" from Girling that required Plaintiff's signature.

33. Defendant Newman explained that these patients had already received services but lacked a primary care provider's signature on the forms.

34. On August 26, 2025, after several failed attempts to send the files via Docusign, Defendant Newman emailed Plaintiff a 224-page PDF containing 52 separate patient Care Plans to sign off on.

35. Upon review, Plaintiff discovered that these were not new or recent patient plans; the plans were for services with dates ranging from July 2024 to May 2025 - a period entirely before Plaintiff's employment with Defendants began.

36. The signature block on these forms required Plaintiff to falsely certify, under penalty of law, that each patient was "under my care," that Plaintiff had "authorized services in this care plan," and that Plaintiff would "periodically review the plan."

37. Upon reviewing the care plans, Plaintiff understood that the certifications Defendants demanded she sign were required documentation used to support reimbursement claims for home healthcare services provided to patients eligible for government healthcare programs, including Medicare and Medicaid. Federal healthcare regulations require that such services be authorized and periodically reviewed by a treating provider. By demanding that Plaintiff falsely certify that these patients were "under [her] care" and that she had authorized and would review the services reflected in those plans, despite the fact that the services predated her

employment and she had never treated those patients, Defendants sought to create false documentation necessary to obtain or retain payment from government healthcare programs.

38. The certifications Defendants demanded Plaintiff sign were required for the submission and/or support of reimbursement claims for healthcare services provided to homebound patients through government healthcare programs, including Medicare and Medicaid. The falsified care plans and altered medical records were intended to create documentation necessary to secure payment from those government programs for services that had not been properly authorized or certified by a treating provider.

39. This was a blatant and illegal request for Plaintiff to attest to care she had not ordered, overseen, or participated in.

***Plaintiff Refuses to Commit Fraud and Receives First Retaliatory Threat***

40. On August 27, 2025, during a 14-minute conference call with Defendant Newman and Defendants staff member Herman Ross ("Ross"), Plaintiff unequivocally refused to sign the backdated forms.

41. Plaintiff informed Defendants Newman and Ross that she considered the request to be illegal, as Plaintiff was not the treating provider during the specified dates and could not truthfully sign the certification statement.

42. Based on her training and experience as a licensed nurse practitioner, Plaintiff reasonably understood that Defendants' demand that she falsely certify care plans and alter patient medical records was intended to facilitate the submission of false or fraudulent claims for reimbursement to government healthcare programs. Plaintiff therefore objected to and refused to participate in conduct that she reasonably believed constituted healthcare billing fraud.

43. Ross confirmed the fraudulent nature of the request, stating that Girling needed the forms signed so that Girling could "bill for the services and get paid."

44. In direct and immediate response to Plaintiff's refusal to participate in this scheme, Defendant Newman levied his first retaliatory threat.

45. For the first time since Plaintiff's employment began, Defendant Newman claimed that "patient volume has been low" and that Defendant Newman had to "justify [Plaintiff's] employment with the company with [Defendant] Newman's 'financial guy'."

46. This statement, made only moments after Plaintiff refused to commit an illegal act, establishes a clear retaliatory animus towards Plaintiff's refusal, and demonstrates that Plaintiff's job security was explicitly linked to Plaintiff's willingness to participate in Defendants' fraudulent practices.

***Girling's Unethical Demand to Falsify a Patient's Medical Record and Defendants' Retaliation***

47. On September 5, 2025, Plaintiff's ethical and professional integrity was again tested.

48. Two days prior, on September 3, 2025, Plaintiff had conducted a telehealth evaluation of a patient for physical therapy services.

49. During that visit, both the patient and the patient's daughter, repeatedly and explicitly denied that the patient was experiencing any current or recent pain, a fact Plaintiff accurately documented in the patient's medical record.

50. On September 5, 2025, a Girling employee identified as "Umidat" sent Plaintiff a message via the Monday.com work platform.

51. Umidat stated that the physical therapy request had been declined and instructed Plaintiff to alter the patient's chart, writing, "we need [sic] update PPW and notify Pt is experiencing exacerbation of extreme back pain for past week which is limiting her mobility fully."

52. Plaintiff understood that altering the patient’s medical record to falsely report severe pain would generate documentation required to secure approval and reimbursement for additional services. Plaintiff refused to falsify the record because doing so would create a materially false medical record used to support billing for services that had not been properly authorized.

53. When Plaintiff reiterated that her assessment contradicted this statement, Umidat insisted, "I understand, but girling is declining that PPW hence we have to update the ppw by stating pt condition worsened for past week in order for ghc to be able to provide services."

54. Recognizing this for what this was - a direct order to commit fraud and falsify a medical record - Plaintiff stood her ground.

55. Plaintiff asked, "Are you asking me to falsify the record?" - copying Defendant Newman and Justin Gerber - and refused to alter the accurate medical record.

56. Plaintiff instead offered the only ethical option: to schedule a new appointment to re-evaluate the patient's condition.

***<u>Defendants’ Swift and Pretextual Retaliatory Termination</u>***

57. The retaliation for Plaintiff's final act of integrity was swift and undisguised.

58. Approximately 20 minutes after Plaintiff refused to falsify a patient's medical record on September 5, 2025, Plaintiff received a one minute call from Defendant Newman who terminated Plaintiff's employment, effective immediately.

59. The reason Defendant Newman gave for the termination - "low patient volume" - was the exact same pretextual threat Defendant Newman had used weeks earlier when Plaintiff first refused to participate in Defendants' fraudulent backdating scheme.

60. The damning temporal proximity between Plaintiff's protected refusal to falsify a patient's record and her termination leaves no doubt that the stated reason was a sham.

61. Defendants fired a principled Nurse Practitioner not for performance or business volume issues, but as a direct and unlawful punishment for Plaintiff's repeated refusal to engage in illegal conduct that jeopardized patient care and constituted billing fraud.

## FIRST CLAIM FOR RELIEF AGAINST CORPORATE DEFENDANTS

*Retaliation in Violation of the False Claims Act, 31 U.S.C. §3730(h)*

62. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

63. The False Claims Act prohibits employers from retaliating against employees who engage in activity protected by the FCA, including investigating, reporting, or refusing to participate in conduct that the employee reasonably believes constitutes a violation of the FCA.

64. As set forth above, Plaintiff engaged in protected activity under the FCA by refusing to participate in fraudulent billing schemes, refusing to sign backdated care plans for patients not under her care, and refusing to falsify medical records to facilitate improper billing.

65. Corporate Defendants retaliated against Plaintiff by terminating her employment immediately after she refused to falsify a patient's medical record, using the pretextual reason of "low patient volume."

66. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FCA, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages.

67. As a direct and proximate result of the Corporate Defendants' retaliatory conduct in violation of the FCA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

68. The Corporate Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the FCA, for which Plaintiff is entitled to reinstatement, double back pay, and other relief.

**SECOND CLAIM FOR RELIEF AGAINST CORPORATE DEFENDANTS**

*Retaliation in Violation of the New York False Claims Act, N.Y. State Fin. Law § 191*

69. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

70. The New York False Claims Act prohibits employers from retaliating against employees who engage in activity protected by the NYFCA, including investigating, reporting, or refusing to participate in conduct that the employee reasonably believes constitutes a violation of the NYFCA.

71. As set forth above, Plaintiff engaged in protected activity under the NYFCA by refusing to participate in fraudulent billing schemes, refusing to sign backdated care plans for patients not under her care, and refusing to falsify medical records to facilitate improper billing.

72. The Corporate Defendants retaliated against Plaintiff by terminating her employment immediately after she refused to falsify a patient's medical record, using the pretextual reason of "low patient volume."

73. As a direct and proximate result of Corporate Defendants' unlawful retaliatory conduct in violation of the NYFCA, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages.

74. As a direct and proximate result of the Corporate Defendants' retaliatory conduct in violation of the NYFCA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS

*Retaliation in Violation of NYLL § 740*

75. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

76. New York Labor Law § 740, as amended effective January 26, 2022, prohibits an employer from taking any "retaliatory action" against an employee because the employee discloses or threatens to disclose to a supervisor or to a public body an employer activity, policy, or practice that the employee reasonably believes violates any law, rule, or regulation, or reasonably believes poses a substantial and specific danger to the public health or safety.

77. As set forth above, Plaintiff engaged in protected activity under § 740 by disclosing to supervisors and objecting to employer activities, policies, and practices that she reasonably believed violated law, rule, or regulation and implicated significant compliance failures.

78. Specifically, Plaintiff reported and refused to participate in fraudulent billing schemes involving backdated care plans and falsification of medical records in violation of federal and state healthcare fraud statutes.

79. Thereafter, Defendants engaged in retaliatory action within the meaning of § 740 by terminating Plaintiff's employment immediately after her refusal to falsify a patient's medical record.

80. Defendants' retaliatory actions against Plaintiff violated NYLL § 740.

81. As a direct and proximate result of Defendants' conduct in violation of NYLL § 740, Plaintiff has suffered, and continues to suffer, damages including, but not limited to, lost past and future income, compensation, and benefits.

## **FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*Retaliation in Violation of NYLL § 741*

82. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

83. New York Labor Law § 741 prohibits employers from retaliating against employees who report or refuse to participate in conduct that endangers the health or safety of patients or the public.

84. As set forth above, Plaintiff engaged in protected activity under § 741 by refusing to participate in conduct that endangered patient health and safety, including refusing to falsify medical records and refusing to attest to care she did not provide.

85. Defendants retaliated against Plaintiff by terminating her employment immediately after she refused to falsify a patient's medical record, conduct that would have endangered patient safety by creating false medical information.

86. As a direct and proximate result of Defendants' conduct in violation of NYLL § 741, Plaintiff has suffered, and continues to suffer, damages including, but not limited to, lost past and future income, compensation, and benefits.

## DEMAND FOR A JURY TRIAL

87. Pursuant to FRCP 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a. A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State laws;

b. Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

d. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

e. Double back pay and other relief as recoverable to the fullest extent permitted by law;

f. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

g. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

h. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

i. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
April 17, 2026

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By: ______________________

CAITLIN DUFFY, ESQ.
825 Third Avenue, Suite 2100
New York, New York 10022
Tel.: (212) 227-5700
Fax: (212) 656-1889
*Attorneys for Plaintiff*